STATE OF CONNECTICUT *v.* ISIDRO RIVERA
(10974)

LAVERY, LANDAU and HEIMAN, Js.

194

Argued June 7—decision released July 27, 1993

*Auden Grogins,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *C. Robert Satti, Jr.,* assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree, in violation of General Statutes § 53a-134 (a) (3).[1] The trial court rendered an oral judgment of acquittal to an additional charge of assault in

---

[1] General Statutes § 53a-134 provides in pertinent part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

the second degree. On appeal, the defendant asserts that the state produced insufficient evidence for the jury to find him guilty of robbery in the first degree and that the trial court was thus obligated to render a judgment of acquittal with respect to that charge. In particular, the defendant posits that the evidence was fatally deficient in identifying him as a participant in the robbery. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 22, 1990, at about 12:42 a.m., Officer Michael Gosha, a member of the Bridgeport police department, was on patrol on the west side of Bridgeport when he was dispatched to the area of building sixteen in the P.T. Barnum housing project. Upon arrival, he observed a taxicab in the parking lot behind building sixteen, parked approximately 100 feet from Taylor Drive. Upon investigation, Gosha found Roberto Mejias seated in the cab, with his legs outside the vehicle. Mejias appeared to be shaken and his right index finger was bleeding.

Mejias told Gosha that he had been robbed by two individuals. After the victim left by ambulance, Gosha drove around the area looking for the individuals described to him by Mejias, but was unsuccessful.

The parking lot was not lighted that night, but there was light from street lights on Taylor Drive. The lights fixed to the buildings in the area were not working, and, although the area was lighted to some extent from the lights on Taylor Drive, the lighting in the parking lot was poor.

On November 24, 1990, two days after the robbery, Officer Daniel Garcia of the Bridgeport police department was dispatched at approximately 3:45 a.m. to transport Mejias. Garcia met Mejias at the cab company office on Main Street in Bridgeport. They went

to building sixteen, apartment 102, at the Barnum complex on the basis of Mejias' statement that he had information that the persons who had perpetrated the robbery on him were at that apartment.

Garcia entered the building and went to apartment 102. He found a husky Hispanic male with a cast on his leg and walking with crutches, who matched the description that had been given to Garcia of one of the persons involved in the robbery. Garcia took that individual, Edwin Lopez, into custody and brought him to the police cruiser, where Mejias identified him as one of the perpetrators of the robbery. Garcia called for additional police assistance and Officer Ruby Crear arrived. Garcia placed Lopez in his police cruiser to take him to police headquarters for booking. Mejias entered the police vehicle operated by Crear. Both vehicles then left the area. The vehicle operated by Garcia was about twenty feet in front of the vehicle operated by Crear.

At about 5 a.m., the two vehicles proceeded to St. Stephens Street and then to Albion Street in the vicinity of the Evergreen Apartments. Garcia observed three males walking in the area of the Evergreen Apartments. He observed that two of the men were African-American and the third was Hispanic. The area was sufficiently illuminated for a person to see a short distance ahead. Daylight was beginning to appear and the street lights as well as the headlights of Garcia's vehicle lighted the area.

Garcia received a radio transmission from Crear's vehicle indicating that the victim said the Hispanic male looked like the second perpetrator. Garcia stopped his vehicle, exited it and walked toward the three males. The three entered the grounds of the Evergreen Apartments. Garcia called out "Tito," a name that he had heard at the Barnum project. The three continued to walk until Garcia again called out "Tito" and pointed

his flashlight at them. This time, the Hispanic male turned around. The individual fit the description given by Mejias of a Hispanic male, shorter than Lopez, with a "fade" haircut.

Garcia brought the Hispanic male, the defendant, back to the vicinity of the police vehicle in which Mejias was a passenger. The take down lights[2] of the police vehicle were lighted. Garcia brought the defendant to a point about seven feet in front of the police vehicle in which Mejias was seated. Mejias positively identified the defendant as the second individual involved in the robbery of November 22, 1990. As soon as Mejias positively identified the defendant, Garcia arrested and charged him with the commission of the offenses.

The only evidentiary issue that the defendant raises with respect to this conviction is that the evidence produced was grossly insufficient to prove his guilt of the offense of robbery in the first degree beyond a reasonable doubt. He posits that the attempted in-court identification by the victim was of such a nature that, as a matter of law, the jury could not reasonably conclude that the state had established beyond a reasonable doubt the identification of the defendant as one of the participants in the robbery of Mejias. We disagree and conclude that the evidence was sufficient to support the jury finding.[3]

---

[2] Take down lights are the lights on a police vehicle located on the top portion of the strobe lights that have as their purpose the illumination of the area to the front of the vehicle.

[3] We note that no claim was made that the victim's out-of-court identification of the defendant was unnecessarily suggestive or otherwise violative of the defendant's rights. See *Neil* v. *Biggers,* 409 U.S. 188, 193, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State* v. *Plaza,* 23 Conn. App. 543, 583 A.2d 925 (1990), cert. denied, 217 Conn. 811, 587 A.2d 153 (1991). Nor did the defendant raise on appeal any claim that the trial court acted improperly in permitting the police officers to testify as to the victim's statements concerning his identification of the defendant at the Evergreen Apartments two nights after the robbery. See *State* v. *Outlaw,* 216 Conn. 492, 497, 582

Certain additional facts are necessary for a proper resolution of this issue. At trial, the state called the victim as a witness. The victim could not speak fluent English and required the services of a court interpreter. At times during his testimony, the victim answered questions without waiting for the services of the interpreter.

The victim testified that in the early morning hours at the end of November, 1990, he had been dispatched to 752 East Main Street to pick up a fare. When he arrived at that address, two Hispanic males and a Hispanic female entered his cab. They directed him to take them to the Barnum project, to the area of the parking lot behind building sixteen. The victim testified that one of the men, Edwin Lopez, used crutches. He testified further that Lopez displayed a knife. Subsequently, Lopez placed the knife near the victim's throat. He also testified that money was removed from his pocket by the other Hispanic male. In stating that the other person had removed the money from his pocket, the victim referred to that other person as Isidro Rivera. The victim also testified that when he attempted to push the knife away from his neck, his finger was cut.

The state's attorney then asked the victim to look around the courtroom to see if he saw the person who took the money. The victim responded negatively.[4]

A.2d 751 (1990); *State* v. *Townsend,* 206 Conn. 621, 624, 539 A.2d 114 (1988); *State* v. *Rose,* 29 Conn. App. 421, 424, 615 A.2d 1058, cert. denied, 224 Conn. 923, 618 A.2d 529 (1992). Thus, no attack is made against the propriety of the out-of-court identification by the defendant, nor against his own testimony with respect to that identification, or against the officers' being permitted to testify as to the identification of the defendant by the victim.

[4] The transcript reveals the following question and answer:

"[State's Attorney]: Mr. Mejias, would you look around this court and see if you see the other man that took the money in the courtroom today?

"[Mejias responding in English]: Nope."

Later in the direct examination, the victim testified that he had identified the defendant as one of the perpetrators when the defendant was brought near the cab at the time of the arrest.[5] The victim further testified that he had an opportunity on the evening of the robbery to observe the faces of the perpetrators for about five minutes by the lights in the cab and by the cab's headlights as the perpetrators walked away.

The state's attorney then asked the victim if he saw the individual in the courtroom that he had seen outside of the police vehicle on the night of November 24, 1990. He responded affirmatively and identified the defendant as that person.[6]

Our review of the evidence reveals that Mejias was robbed at knifepoint by the combined activities of two Hispanic males, one having a leg cast and walking with crutches and the second, shorter than the first, with a fade haircut. He observed these two men in his cab,

[5] The transcript reveals the following question and answer:

"[State's Attorney]: Did you say anything to the police after you saw the person? Can you answer my question?

"[Witness]: When they took the guy, they brought him close to the car and they asked me if he was the guy. And I said yes."

[6] The transcript reveals the following questions and answers relating to the identification process:

"[State's Attorney]: Mr. Mejias, would you stand up, please. Ask you if you would look around the courtroom and see if you see anybody that you recognize was the individual that the police had outside that automobile on the night of November 24, 1990.

\* \* \*

"[State's Attorney]: Can you answer my question?

"[Witness]: Could you repeat it.

"[State's Attorney]: Look around the courtroom. See if you see the person that was outside of the car in the vicinity of the Evergreen Apartments.

"[Witness responding in English]: Yeah.

"[State's Attorney]: We got an answer. I didn't hear it.

"[Witness]: Yes."

The transcript further reveals that the witness identified the defendant as that person.

together with a woman passenger, for about five minutes with the interior lights on. He also observed the two individuals in the headlights of the cab as they left after the robbery. The evidence also reveals that on November 24, 1990, two days after the robbery, the victim called the police because he had information that the perpetrators could be found in apartment 102, building sixteen, of the Barnum project. The evidence also establishes that on that night, the police apprehended the alleged accomplice, Lopez, at that apartment and the victim identified him as one of the two Hispanic males that participated in the robbery. The evidence reveals that, shortly thereafter, the victim saw the defendant walking on the street with two black males, informed the police that the defendant looked like the second Hispanic male involved in the robbery, and, when he observed the defendant about seven feet away from the police vehicle in which he was a passenger, positively identified the defendant as the second participant in the robbery two nights before. The evidence also reflects that the defendant was the individual that removed the money from the victim's pocket. As we have previously stated, while the victim did not, by an in-court identification, identify the defendant as one of the perpetrators, he did, in fact, identify the defendant as the person he had identified as the perpetrator outside the Evergreen Apartments two nights after the robbery.

When reviewing sufficiency of the evidence claims, we impose a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. *State* v. *Salz,* 226 Conn. 20, 31, 627 A.2d 862 (1993); *State* v. *Hooks,* 30 Conn. App. 232, 238, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993); *State* v. *Young,* 29 Conn. App. 754, 767, 618 A.2d 615 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993). Second, we " 'determine whether, from that evi-

dence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt.' '' *State* v. *Hooks,* supra; *State* v. *Salz,* supra. '' 'In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' '' *State* v. *Salz,* supra; *State* v. *Somerville,* 214 Conn. 378, 390, 572 A.2d 944 (1990); *State* v. *Hooks,* supra, 238–39; *State* v. *Maxwell,* 29 Conn. App. 704, 708, 618 A.2d 43, cert. denied, 225 Conn. 904, 621 A.2d 287 (1993). Where, as here, the identification of the defendant is derived from circumstantial evidence, it is, nonetheless, the cumulative impact of a multitude of factors that must be examined to determine whether the identification of the defendant has been satisfactorily established by circumstantial evidence. *State* v. *Salz,* supra, 38; *State* v. *Henning,* 220 Conn. 417, 421, 599 A.2d 1065 (1991); *State* v. *Pearl,* 28 Conn. App. 521, 526, 613 A.2d 304 (1992). "In criminal cases, including the most serious ones, the fact that an accused was the person who committed the criminal act may be proved by circumstantial evidence." 1 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) § 64b; see *Bradbury* v. *South Norwalk,* 80 Conn. 298, 301, 68 A. 321 (1907).

The jury's sole province as the trier of fact is to draw all reasonable and logical inferences from the facts as it finds them to exist. *State* v. *Gray,* 221 Conn. 713, 721, 607 A.2d 391, cert. denied, U.S. , 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); *State* v. *Hooks,* supra, 239. The jury also has the sole and absolute responsibility to weigh conflicting evidence and to determine the credibility of the witnesses. *State* v. *Pinnock,* 220 Conn. 765, 778–79, 601 A.2d 521 (1992); *State* v. *Hooks,* supra. The issue of the identification of the accused as the perpetrator of the crime is peculiarly one of fact to be resolved by the jury. *State* v. *Smith,* 138 Conn.

196, 201, 82 A.2d 816 (1951). "If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." Id., 200.

The test for determining whether the evidence is sufficient to sustain a verdict is thus "whether the [trier of fact] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. . . ." (Internal quotation marks omitted.) *State* v. *Haddad,* 189 Conn. 383, 387, 456 A.2d 316 (1983); *State* v. *Salz,* supra, 30; *State* v. *Hooks,* supra.

As we have stated, the issue of whether the defendant perpetrated the crime was properly a question of fact to be resolved by the jury. *State* v. *Smith,* supra. The jury had the opportunity to have before it the unequivocal and certain identification of the defendant by the victim made two days after the incident. It had his negative answer to the question propounded by the state's attorney as to whether he saw in the courtroom the man who had taken his money. Thus, the jury was in a unique position to determine whether his memory was better two days after the incident than at trial and whether it believed his earlier identification of the defendant as the second person involved. The jury also had before it the fact that the victim was not fluent in English, had a seventh grade education, and often attempted to answer questions before the interpreter had an opportunity to translate the question.

The jury was within its right to draw an inference that the defendant had in fact been the perpetrator of the crime on the basis of the victim's prior out-of-court identification of the defendant. The function of the jury is to weigh the impact of the negative answer against

the prior unequivocal and certain identification of the defendant shortly after the incident. In this context, we rely on "the good sense and judgment of American juries to weigh evidence with some element of untrustworthiness since such evidence 'is customary grist for the jury mill.' " *State* v. *Fullwood,* 193 Conn. 238, 254, 476 A.2d 550 (1984).

The defendant's claim that the evidence was insufficient to identify him as a participant in the crime is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.